1

2

3

4

5

6

7

8                            UNITED STATES DISTRICT COURT

9                         FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11    JAVIER LOPEZ DIAZ,                          Case No.  2:22-cv-0252-DC-JDP (P)

12                     Petitioner,

13           v.                                    FINDINGS AND RECOMMENDATIONS

14    PATRICK COVELLO,

15                     Respondent.

16

17

18           Petitioner Javier Lopez Diaz, a state prisoner proceeding without counsel, seeks a writ of

19    habeas corpus under 28 U.S.C. § 2254, contending (1) that there was insufficient evidence that

20    the victim's participation in the sexual acts was impelled by duress; (2) ineffective assistance of

21    trial counsel; (3) California Code § 1108 violated petitioner's due process right to a fair trial by

22    allowing the admission of sexual offenses that were subject to proof by propensity; and

23    (4) CALCRIM No. 1191A allowed jurors to infer guilt of the charged offenses based on

24    propensity, and it confused and misled the jury as to the burden of proof.  ECF No. 1.[1]

25    _____

26           [1] Petitioner argued that the trial court erred when it failed *sua sponte* to instruct on the
      lesser included offenses of non-forcible oral copulation with a minor and unlawful sexual
27    intercourse with a minor.  ECF No. 1.  Upon respondent's motion, ECF No. 11, I recommended
      that such claim be dismissed, ECF No. 20, and the district court adopted this recommendation,
28    ECF No. 22.

                                                    1

1  Respondents have filed an answer.   ECF No. 25.  After reviewing the pleadings, I recommend

2  that the petition be denied.

3                              **Background**

4          I have reviewed the background summary drafted by the state appellate court on direct

5  appeal.  It is correct, and I reproduce it here:

6              Defendant Javier Lopez Diaz repeatedly molested his then-
             girlfriend's younger sister, S.D., when she was between the ages of
7           seven and 15 years old.  A jury found him guilty of multiple sex
             offenses, including three counts of committing a lewd and
8           lascivious act on a child under 14 years of age (Pen. Code, § 288
             subd. (a); counts two, three, and four),[] five counts of committing
9           an aggravated lewd and lascivious act on a child under 14 years of
             age (§ 288, subd. (b)(1); counts five through nine), three counts of
10          forcible oral copulation, (former § 288a, subd. (c)(2);[] counts ten,
             eleven, and thirteen), and two counts of forcible rape (§ 261, subd.
11          (a)(2); counts twelve and fourteen).[2]  The trial court sentenced
             him to an aggregate term of 70 years in prison, and he timely
12          appealed.

13          On appeal, defendant contends the judgment must be reversed due
             to insufficient evidence, instructional error, evidentiary error,
14          ineffective assistance of counsel, and sentencing error.  We will
             modify the judgment to impose the mandatory court operations and
15          court facilities assessments (§ 1465.8; Gov. Code, § 70373), and to
             reflect one additional day of custody credit.  As modified, the
16          judgment is affirmed.

17          **BACKGROUND**

18          We summarize the facts adduced at trial; additional information
             relevant to the claims raised on appeal is set forth in the Discussion
19          as needed.

20          *S.D., Ella, and Defendant*

21          S.D., aged 26 when she testified at trial, was born in Belarus in
             November 1991.  In June 1997 her family moved to Sacramento.
22          At that time, she was five years old and her older sister, Ella, was
             22 or 23 years old.  Because of the age difference, Ella was "just
23          like a mother" to S.D.

24          In February 1998 Ella began dating defendant and moved in with
             him in July 1999.  At that time, she was 24 or 25 years old and he
25          was 37 or 38 years old.

26  _____

27          [2] [footnote from opinion] The jury found defendant not guilty on count one, committing a
     lewd and lascivious act on a child under 14 years of age.  (§ 288, subd. (a).)  The incident giving
28   rise to this charge involved defendant allegedly touching S.D.'s vagina over her swimsuit in a
     swimming pool, when she was around seven years old.

                                          2

*Counts Two and Three: Lewd and Lascivious Acts*

In 1999 Ella and defendant took S.D. to Disneyland for her eighth birthday.  On that trip, defendant "grope[d]" S.D. several times. While the group was at Disneyland, defendant rubbed S.D.'s vagina over her clothes on at least two rides.  S.D. did not tell defendant to stop; she did move his hand away and tried not to sit next to him on rides.  Defendant's acts at Disneyland were the bases for counts two and three.

Although S.D. knew the touching was wrong, she did not tell Ella about it.  She felt ashamed and blamed herself for what had happened.  S.D. explained that she did not disclose the abuse because Ella already had a "bad relationship" with their family and she did not want Ella to be rejected by the family.

*Count Four: Lewd and Lascivious Act*

Beginning when she was around seven or eight years old, S.D. regularly spent the weekend with Ella and defendant at their apartment in downtown Sacramento.  Initially, S.D. and Ella slept together in the bedroom while defendant slept on the couch.  However, after the "first few weekends," he slept with them in the bedroom and in the bed.  At first, he wore a T-shirt and/or underwear to bed, but later he slept naked.  Ella never commented on the situation.

When S.D. was between the ages of seven and 10 years old, defendant held her around her stomach, put his hand between her legs on her vagina, and pressed his erect penis against her lower back or buttocks while she was trying to sleep.  She repeatedly told him "no" and tried to move away but he did not stop.  He told her that he was not doing anything wrong, and that she was "seeing things," lying, and acting crazy.  She eventually gave up on trying to stop defendant from touching her because "it never worked." This made her angry, since she knew what was happening and felt like she "didn't have a voice."  During this same time period, defendant walked around his apartment with no underwear, rubbed his erect penis in front of S.D., and bounced her on his lap and then pressed her down on his erect penis.  Defendant's acts of pressing his erect penis against S.D. in bed were the bases for count four.

S.D. did not tell her parents about defendant's behavior because she felt ashamed and was afraid of being abandoned.  When asked why she feared abandonment, S.D. said, "Because I felt like what was happening to me was really awful and it wasn't proper and it was the worse [*sic*] thing that I could have ever done."

*Counts Five and Six: Aggravated Lewd and Lascivious Acts*

When S.D. was between the ages of 12 and 13, defendant started "dry-hump[ing]" her at his apartment while Ella was away.  He would ask her to lie face-down on his bed and then get on top of her.  She would look out the window and try to "tune out" what he was doing.  Defendant's "dry-humping" of S.D. was the basis for

3

count five.  S.D. explained that she complied with defendant's request to lie down on the bed because she "knew [she] couldn't tell him no," and because he would treat her "poorly" if she refused. By this time, S.D. knew that defendant would "berate" and punish her if she failed to comply with his demands.  She felt like "[t]here wasn't a choice" and she "couldn't tell him no" because, at that point, the molestation was "deeply imbedded" and something she "had to do."  She explained that she was afraid of defendant because she had seen him throw things and threaten Ella during arguments.  S.D. further explained that she felt "terrified" whenever defendant and Ella argued.

When S.D. was around 12 years old, she complained of having a stomachache.  Defendant took her into the bedroom and put his hand into her underwear and touched her vagina.  She said "no," and then lifted his hand and told him, "This is where it hurts." Although she was "visibly angry," he smiled and ignored her.  He put his hand back into her underwear, "cupp[ed]" her vagina, and then inserted two fingers.  S.D. did not call out to Ella for help because she "didn't feel like [she] could."  This incident was the basis for count six.

S.D. explained that she had become visibly angry with defendant when he was touching her on other occasions, but he never addressed her anger.  He just continued to touch her, which made her feel angrier.  When asked, S.D. said that she never did anything when she became angry at defendant because she "knew it would make [the situation] worse."

*Counts Seven and Eight: Aggravated Lewd and Lascivious Acts*

Beginning when S.D. was 11 or 12 years old, she and defendant occasionally went on walks to a parking structure near his apartment and took the elevator to the top floor to enjoy the view.  On a few occasions, defendant pressed her against a railing from behind and rubbed his erect penis against her lower back and buttocks.  On one occasion when she was 12 or 13 years old, defendant pressed her against a railing from behind and then reached under her skirt and rubbed her vagina over her underwear. Two incidents of defendant touching S.D. in the parking structure formed the bases for counts seven and eight.

S.D. explained that she did not attempt to avoid going on walks to the parking structure with defendant because "[i]t wouldn't have made a difference."  She further explained that she did not say anything to him during these incidents; she "just . . . tuned him out" when he was touching her in a sexual way.

*Count Nine: Aggravated Lewd and Lascivious Act*

Around a month before S.D. turned 13 years old, Ella and defendant decided to take her to a Halloween "house party" dressed in a "school-girl" outfit, which made her feel exposed.  The outfit consisted of a shirt which tied under her breasts and exposed her midriff, a miniskirt, white lace underwear, thigh-high socks, and

high-heeled shoes.  After S.D. changed into the white lace underwear, defendant rubbed her vagina over her underwear.  This incident was the basis for count nine.  S.D. noted that it was defendant's idea for her to wear the white lace underwear, which belonged to Ella.

When S.D. was asked whether defendant had touched her on any other occasion when she was between the ages of seven and 13 years old, she said that he was "almost constant[ly]" touching her in a sexual way during that time period.  She described the touching as "routine."  At trial, she recounted the incidents that stuck out in her mind for one reason or another and said that the rest of the incidents all bled together.  She explained that the constant molestation made her feel isolated, alone, and ashamed.  She felt like there was no way to escape from defendant; her only hope was that Ella would break-up with him.  But that never happened.  Instead, the sexual conduct escalated from touching and "dry-humping" to oral sex and sexual intercourse.

*Count Ten: Forcible Oral Copulation*

When S.D. was 13 years old, she orally copulated defendant for the first time.  At that time, defendant and Ella were living at a house that was about a 20-minute drive from S.D.'s parents' house.  When defendant would drive S.D. home, which was a common occurrence, he always started an argument, "[u]sually because [she] was begging to go home."  On one such occasion, he pulled into a parking lot in an industrial area at around 8:00 p.m. and yelled at her.  He told her that the only way he would forgive her and take her home was if she orally copulated him and swallowed the ejaculate.  She was crying while he was yelling at her.  After she orally copulated him, she spit out the ejaculate.  This made defendant angry, but he eventually calmed down and drove her home.  This was the basis for count ten.

S.D. explained that she was too afraid to refuse defendant's demand for oral sex.  When she was asked to describe what she was thinking about at the time, she said, "That I needed to do a good job or the consequences might be worse."  The consequences she feared included "everything from violence to just berating."

*Counts Eleven and Thirteen: Forcible Oral Copulation*

When S.D. was 14 and 15 years old, she orally copulated defendant numerous times.  She could not recall the specific details of each incident.  She explained that the details were "fuzzy" because the incidents occurred frequently, and because they tended to be traumatic, since he would scream, yell, and threaten her.  At trial, S.D. recounted two additional incidents when she orally copulated defendant.

In the first incident, S.D. was between the ages of 14 and 16 years old.  During an argument in the car, defendant pulled over into a parking lot; it was cold, rainy, and very late at night.  Afraid and crying, she orally copulated him.

5

The second incident occurred during a family vacation when S.D. was around 15 years old. One evening, she, defendant, and several other people were hanging out at the pool area of a hotel. At one point, a "young guy" started "hitting" on her, which made defendant jealous. Thereafter, defendant cornered her in the pool and tried to kiss her, but she turned away, which made him angry. She started to cry and left the area. When he found her, he was still angry. As they talked, she "was crying, pretty much begging for forgiveness because [she] was just tired of being yelled at." He forgave her after she orally copulated him in his hotel room and swallowed some of the ejaculate, which was a "common condition" to obtain his forgiveness "[e]arly on." Shortly thereafter, Ella came into the room. S.D. was crying and defendant was in the shower. Ella and S.D. did not talk about why S.D. was in the room alone with defendant or why she was crying.

These two acts of oral copulation were the bases for counts eleven and thirteen.

S.D. explained that she never initiated oral sex with defendant, and that there were times when she knew she "had to," even though he did not ask, "because there was an argument" and the oral sex would "assuage the situation."

*Count Twelve: Forcible Rape*

When S.D. was 14 years old and a sophomore in high school, defendant had sexual intercourse with her for the first time. After Ella left the house, he led S.D. into the bedroom and had her lie on his bed. She cried and looked away as he penetrated her. She could not recall if she told him "no," but she was "reluctant as always" and did not remember "being given a choice." At that point, she felt like there was nothing she could do to make him stop. She did not tell Ella about the incident because she felt ashamed. This episode formed the basis for count twelve.

S.D. explained that, prior to this incident, defendant had repeatedly pressured her to have sexual intercourse with him during her entire freshman year of high school. He told her that she needed to have sex with someone she trusted in order to be prepared for high school. He said that it would "benefit [her] greatly" to have sex with him because he was like a close member of the family and would not hurt her. He claimed that it was Ella's idea and warned S.D. that if she refused to have sex with him, she would have a difficult time in high school with her peers and end up with someone who would hurt her. S.D. repeatedly refused defendant's demands for sex, but he did not respect her wishes. Instead, he continued "to argue his point."

*Count Fourteen: Forcible Rape*

When defendant was a sophomore, junior, and senior in high school, her school day started at a later time on Wednesday. During her sophomore year, defendant routinely showed up at her parents' house on Wednesday mornings and had sexual intercourse

6

with her after her parents had left for work. He would then drive
her to school. In November of that school year, she turned 15 years
old. Thereafter, he continued to have sex with her on Wednesday
mornings at her parents' house. This occurred throughout her
sophomore year and into her junior year of high school. The
prosecution identified an act of sexual intercourse on one such
Wednesday when S.D. was 15 as the basis for count fourteen.

*Disclosure of the Sexual Abuse*

After her parents moved, S.D. stayed with Ella and defendant
during the week because they lived closer to her school. This
arrangement began at the end of her junior year of high school.
Thereafter, including throughout her senior year of high school,
defendant regularly had sexual intercourse with S.D. on mornings
when Ella was out of the house. When asked, S.D. said that she
tried to tell him "no," but "[b]y that point, it didn't matter." She
explained that she had told him "no" many times but "[i]t got to the
point where he would say, 'Don't ever tell me no.' So when [she]
would say no is usually when the arguments would start." The
arguments would often end with her orally copulating him. This
pattern continued until she graduated from high school.

Following graduation, S.D. continued to live with defendant and
Ella while she attended college at Sacramento State. During that
time period, defendant continued to have sexual intercourse with
S.D. on a regular basis. The sexual relationship continued until she
was 24 years old. S.D. explained that defendant was very
controlling and abusive to her when she was between the ages of 18
and 24. She did not have a driver's license and he did not allow her
to go anywhere.

When asked, S.D. admitted that she gave defendant birthday cards
and Valentine's Day cards but only "because that would appease
him, and if [she] didn't, [she] would most likely get in trouble."
She explained, "My life was if he's happy, I would not be
mistreated. So I went out of my way to try and appease him. Also,
he would always give me things, and it was just implicit that I do
the same in return." S.D. indicated that she never had "fond
feelings" for defendant and never cared for him; she would only
give him things or show him affection to keep him happy.

In April 2016, when S.D. was 24 years old and had obtained her
undergraduate degree and a master's degree, she disclosed
defendant's sexual abuse to Ella and her parents. The disclosure
occurred after defendant and Ella had an argument, and S.D.
decided to end her relationship with defendant and move home.
Shortly thereafter, S.D. reported the abuse to law enforcement. At
that time, defendant was 54 years old.

S.D. was crying hysterically when she told Ella about the abuse.
Ella claimed she had no knowledge of the abuse. She told S.D. to
calm down and assured S.D. that everything was "fine." Ella said
that defendant had "mention[ed] something, and that it was okay
and [S.D.] was still welcome to come and live with them," i.e., Ella

and defendant.  Following this conversation, S.D. felt like she could no longer trust Ella.  S.D. felt betrayed when she learned that Ella had told their mother that S.D. and defendant were both at fault for what had happened.

*Pretext Phone Calls*

During the police investigation into the allegations of sexual abuse, S.D. made two pretext phone calls to defendant in an attempt to get him to talk about the abuse.  The calls were recorded and played for the jury.

The first phone call occurred on defendant's birthday in early July 2016.  In the beginning of that call, defendant told S.D. that he and Ella were no longer together.  Shortly thereafter, S.D. said that she was calling because she had read the letter he had written her, which indicated that he had "fallen for [her]."  In response, he said: "You know I fell in love with you."  After she indicated that they had been together for 10 years and pressed him on when he fell in love with her, he said: "[S.D.] I fell head over heels.  I loved you from the minute I saw you.  I saw this scruffy little girl and I thought that you were like the sweetest thing because the minute I looked into your eyes it was like me the sun chasing the moon and I couldn't stop.  And then you grew up to be a woman and how can any man resist you?  I'm not saying that you know . . . I'm just saying that there is just something about you and it doesn't matter what other people say. . . . When S.D. asked defendant why he did not wait until she was older, he said, "I wanted to confess to your dad many years ago and I wanted to just tell him up front that I had fallen in love with you.  And I always thought that maybe like anyone else age has nothing to do with anything, it's just the way you feel about someone."  When she asked him whether he thought it was wrong for him to repeatedly have sex with her when she was 14 years old, he did not deny that he had engaged in such conduct. Instead, he changed the subject.  Later in the conversation, defendant, again, mentioned that he fell in love with S.D. and did not deny that he had sex with her when she was 14 years old.  He eventually hung up after she pressed him on why he raped her when she was 14 years old.

S.D. made a second pretext phone call around six weeks later.  In that call, defendant talked about how he loved S.D. and still wanted her in his life.  He again admitted that he fell in love with her when she was "a little girl"; the first time he saw her.  At one point she said, "I need to know that you are sorry for what you did to me at fourteen.  I need to know.  I was in high school and I didn't know any better.  I still have nightmares about you.  That's not normal." In response, he said that he was sorry she felt that way and suggested that they get together and talk about what had happened. He eventually hung-up on her after she pressed him on whether he was sorry for having sex with her when she was 14 years old and for touching her when she was young.

Defendant called back immediately.  This call was also recorded and played for the jury.  Defendant again told S.D. that he loved her

1   and wanted her back.  When she asked whether he was sorry for
    having sex with her when she was 14 years old, he said, "I'm sorry
2   [S.D.]"  She replied, "OK I forgive you."  He then repeated, "I'm
    sorry."  He explained that he had gravitated toward her because she
3   was lonely and had gone through "the same shit [he] went through."
    He then disclosed that he had been raped by a man when he was a
4   young boy.  He did not deny S.D.'s accusation that he had engaged
    in similar conduct by "fondling" her when she was eight years old.
5   He also did not deny her accusation that he raped her when she was
    14 years old and touched her as a "kid."  Instead, he said, "Well a
6   lot of that was accidental, [S.D.] but okay."  When she insisted that
    his conduct was not accidental, he said "[o]kay."  Shortly thereafter,
7   he said: "I'm asking for forgiveness, showing remorse, I'm trying
    to save my soul.  And if I don't have to save my soul because I am
8   going to end up behind bars then so be it.  Then that's what . . . I
    ended up doing for myself.  If that is what you want then so be it.
9   Then I'm willing to do it."

10  ECF No. 24-10 at 1-12.

11                          **Discussion**

12  **I.      Legal Standards**

13      A federal court may grant habeas relief when a petitioner shows that his custody violates

14  federal law.  *See* 28 U.S.C. §§ 2241(a), (c)(3), 2254(a); *Williams v. Taylor*, 529 U.S. 362, 374-75

15  (2000).  Section 2254 of Title 28, as amended by the Antiterrorism and Effective Death Penalty

16  Act of 1996 ("AEDPA"), governs a state prisoner's habeas petition.  *See Harrington v. Richter*,

17  562 U.S. 86, 97 (2011).  To decide a § 2254 petition, a federal court examines the decision of the

18  last state court to have issued a reasoned opinion on petitioner's habeas claims.  *See Wilson v.*

19  *Sellers*, 584 U.S. 122, 125 (2018); *Van Lynn v. Farmon*, 347 F.3d 735, 738 (9th Cir. 2003)

20  ("Because, here, neither the court of appeal nor the California Supreme Court issued a reasoned

21  opinion on the merits of this claim, we look to the trial court's decision."); *McCormick v. Adams*,

22  621 F.3d 970, 975-76 (9th Cir. 2010) (reviewing the decision of the court of appeal, which was

23  last reasoned decision of a state court); *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003)

24  ("Because the California Supreme Court denied review of Gill's habeas petition without

25  comment, we look through the unexplained California Supreme Court decision to the last

26  reasoned decision . . . as the basis for the state court's judgment.") (internal quotations omitted).

27

28

                              9

Under AEDPA, a petitioner may obtain relief on federal habeas claims that have been "adjudicated on the merits in state court proceedings" only if the state court's adjudication resulted in a decision (1) "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or (2) "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

## II.    Analysis

### A.  Insufficient Evidence of Duress

Petitioner argues that he was convicted on counts five through fourteen with insufficient evidence in violation of his due process rights. ECF No. 1 at 16. He contends that the state's evidence failed to establish that the victim's participation in the sexual offenses was impelled by duress. *Id.* The state court of appeal rejected these arguments in his direct appeal:

> *Sufficiency of the Evidence*
>
> The defense theory was that defendant and S.D. engaged in a consensual sexual relationship after she turned 18 years old, and that she fabricated her claims of molestation after their relationship ended badly. The defense posited that S.D. was lying about the molestation because she did not want her family to reject her for having a sexual relationship with her sister's boyfriend. The alternative contention was that, even if S.D. was telling the truth about her claims of molestation, there was no evidence supporting the conclusion that the molestation was accomplished by force or duress. Defendant did not testify at trial. Ella and several of defendant's relatives testified as defense witnesses.
>
> On appeal, defendant contends that his convictions on counts five through fourteen must be reversed for insufficient evidence. He does not argue there is insufficient evidence to support the conclusion that he committed the acts giving rise to those offenses, or to support the conclusion that S.D. was under the age of 14 as required for his aggravated lewd and lascivious conduct convictions (counts five through nine). Rather, he argues that there was insufficient evidence to support the prosecutor's theory that the acts underlying counts five through fourteen were accomplished by duress. We disagree.
>
> A. *Standard of Review*
>
> "'When considering a challenge to the sufficiency of the evidence to support a conviction, we review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible,

and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.' [Citation.] We determine 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.' [Citation.] In so doing, a reviewing court 'presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'" (*People v. Edwards* (2013) 57 Cal.4th 658, 715 (*Edwards*).) "'The same standard of review applies to cases in which the prosecution relies primarily on circumstantial evidence. . . . [Citation.] "[I]f the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding." [Citation.] We do not reweigh evidence or reevaluate a witness's credibility.'" (*People v. Houston* (2012) 54 Cal.4th 1186, 1215.)

The jury is entitled to draw reasonable inferences based on the evidence (*People v. Livingston* (2012) 53 Cal.4th 1145, 1166), and we must accept all logical inferences the jury might have drawn from the evidence, even if we would have concluded otherwise (*People v. Salazar* (2016) 63 Cal.4th 214, 242). "'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt. [Citation.]'" (*People v. Zamudio* (2008) 43 Cal.4th 327, 357-358.) "A reversal for insufficient evidence 'is unwarranted unless it appears "that upon no hypothesis whatever is there sufficient substantial evidence to support"' the jury's verdict." (*Id.* at p. 357.)

B. *Analysis*

As we have explained, the jury found defendant guilty of committing 13 sex offenses. As relevant here, the jury found him guilty on counts five through nine, which charged him with committing a lewd and lascivious act on S.D. when she was under 14 years of age by means of force, violence, duress, menace, and threat of great bodily harm; counts ten, eleven, and thirteen, which charged him with accomplishing an act of oral copulation with S.D. against her will by means of force, violence, duress, menace, and fear of immediate and unlawful bodily injury to her; and counts twelve and fourteen, which charged him with accomplishing an act of sexual intercourse with S.D. against her will by means of force, violence, duress, menace, or fear of immediate and unlawful bodily injury to her. During closing arguments, the prosecutor focused on the element of duress with respect to the aggravated/forcible component of counts five through fourteen.

As noted above, defendant contends that reversal is required because there was insufficient evidence that S.D.'s participation in the acts giving rise to these offenses was accomplished by duress.

In the context of an aggravated lewd and lascivious act on a child under 14 years of age (§ 288, subd. (b)(1)) and forcible oral copulation (former § 288a, subd. (c)(2)), "duress" means "'a direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not have been performed or, (2) acquiesce in an act to which one otherwise would not have submitted.'" (*People v. Leal* (2004) 33 Cal.4th 999, 1004; see CALCRIM No. 1015 (Oral Copulation by Force, or Threats); CALCRIM No. 1111 (Lewd or Lascivious Act: By Force or Fear).) In the context of forcible rape, section 261 defines "duress" in the same manner, except that it omits the term "hardship" from the definition. (§ 261, subd. (b); *Leal*, at p. 1007 ["deletion of the term 'hardship' from the definition of 'duress' applies only to the rape and spousal rape statutes"]; *see* CALCRIM No. 1000 (Rape or Spousal Rape by Force, Fear, or Threats).)

With respect to the offenses at issue here, the jury was required to determine the existence of duress by considering the totality of the circumstances. (*People v. Veale* (2008) 160 Cal.App.4th 40, 46 (*Veale*); § 261, subd. (b); CALCRIM Nos. 1000, 1015, 1111.) Relevant factors include the age of the victim, her relationship to the defendant, relative size and age disparities, location of the molestation, the position of dominance and authority of the defendant, and past and present conduct of the defendant toward the victim, including such things as defendant's continuous exploitations of the victim and whether the defendant made threats of harm to the victim or physically controlled the victim when the victim attempted to resist. (*People v. Cochran* (2002) 103 Cal.App.4th 8, 13-14 (*Cochran*), disapproved on other grounds in *People v. Soto* (2011) 51 Cal.4th 229, 248, fn. 12. (*Soto*); *People v. Cardenas* (1994) 21 Cal.App.4th 927, 940; *People v. Senior* (1992) 3 Cal.App.4th 765, 775; *People v. Superior Court* (*Kneip*) (1990) 219 Cal.App.3d 235, 238-239; *People v. Pitmon* (1985) 170 Cal.App.3d 38, 51, disapproved on other grounds in *Soto*, at p. 248, fn. 12.) "The very nature of duress is psychological coercion." (*Cochran*, at p. 15.)

Our Supreme Court has made clear that "the legal definition of duress [under section 288] is objective in nature and not dependent on the response exhibited by a particular victim." (*Soto*, supra, 51 Cal.4th at p. 246.) "[D]uress is measured by a purely objective standard." (*Ibid.*) "Consistent with the language of section 288 and the clear intent of the Legislature, the focus must be on the defendant's wrongful act, not the victim's response to it." (*Ibid.*) There must be a "'direct or implied threat'" (*People v. Leal*, *supra*, 33 Cal.4th at p. 1004) or exploitation of the victim's fear (*Soto*, supra, 51 Cal.4th at p. 251 (conc. opn. of Werdegar, J.)) in accomplishing the act. A rational trier of fact can find duress within the meaning of subdivision (b) of section 288 even if there is no substantial evidence of overt duress if the trier of fact decides that the "inherent imbalance of power in an encounter between a child and an adult bent on sexual conduct" (*Soto*, at pp. 245-246) presented in the charged incident. A perpetrator may use duress against the victim even if the perpetrator's conduct does not

ultimately influence the victim's state of mind.  (*Id.* at p. 243.)
Thus, while the section 288, subdivision (b)(1) punishes defendants
who employ duress, there is no requirement to prove the victim was
coerced or complied because of that duress.

Viewing the evidence in the light most favorable to the judgment,
we conclude there was sufficient evidence from which a reasonable
jury could have concluded that the challenged offenses—committed
when S.D. was aged 11 through 15—were accomplished by duress.
The evidence showed that defendant was in a position of
dominance and authority over S.D. from when she was a small
child, and that he used this position to intimidate, manipulate, and
psychologically coerce her into participating in sexual acts through
fear and express or implied threats of consequences for disobeying
him.

As we have set forth, at all relevant times defendant was the
boyfriend of S.D.'s older sister, and was significantly older than
both Ella and S.D.  He continuously molested S.D. over many
years, beginning when she was only seven years old.  When S.D.
was between the ages of seven to 13 years old, he was "almost
constant[ly]" touching her in a sexual way.  As we have detailed
ante, during this time period, the molestation largely occurred in
defendant's residence (where S.D. often stayed) and at a nearby
parking structure.  When the molestation started, she repeatedly told
him "no," but he refused to stop.  He told her that he was not doing
anything wrong, and that she was "seeing things," lying, and acting
crazy.  She eventually gave up on trying to stop him from touching
her in a sexual way when she was between the ages of seven and 10
years old because "it never worked."  Although S.D. had a close
relationship with her parents, she never told them about the
molestation because she felt ashamed and was afraid of being
abandoned by them if they found out about it.  S.D. also testified
that she did not disclose the abuse because Ella already had a "bad
relationship" with their family and she did not want Ella to be
rejected by the family.  In one of the pretext phone calls, S.D. told
defendant that she wished things could have been different between
them and that he could have been there for her as a friend when she
was younger.  S.D. reminded defendant that she did not have any
friends as a child and was small and alone.  In a later pretext call,
defendant acknowledged that he knew S.D. was lonely as a child
and indicated that this was one of the reasons he "gravitated" to her.

By the time S.D. was 12 years old, she knew that defendant would
treat her "poorly" if she resisted him.  He would "berate" and
punish her if she complained about the molestation.  She felt like
"[t]here wasn't a choice" and she "couldn't tell him no" because, at
that point, the molestation was "deeply imbedded" and something
she "had to do."  In addition to the stomachache incident that
formed the basis for count six, S.D. testified that there were other
instances when she became angry at defendant when he was
touching her, but he never addressed her anger and did not stop.
Because S.D. "knew it would make [the situation] worse," she
never did anything when she became angry at defendant.  When
asked about the molestation that occurred at the parking structure,

S.D. said that she did not attempt to avoid going there with defendant because "[i]t wouldn't have made a difference."

As we have described, the evidence at trial showed that the molestation made S.D. feel isolated, alone, and ashamed, and that she was scared of defendant because she had seen him throw things and threaten Ella during arguments. The acts of oral copulation, which began when she was 13 years old, often occurred after defendant became angry and started an argument, and were traumatic because he would yell, scream, and threaten her. She would resist his demands for oral sex until he escalated the situation with an argument to get his way. There were times, typically during an argument, when she knew she had to orally copulate him to "assuage the situation." He would forgive her and/or treat her better after she orally copulated him. There was also evidence that he used his hands to push her head down if she tried to pull away while she was orally copulating him, and, during the incident that formed the basis for count ten, he refused to drive her home until she orally copulated him and swallowed the ejaculate. She was crying while he was yelling at her, and was too afraid to refuse his demand for oral sex. She feared "everything from violence to just berating."

When S.D. and defendant had sexual intercourse for the first time, he penetrated her while she was crying. This incident occurred after he had repeatedly pressured her to have sex with him during her entire freshman year of high school, as we have detailed ante. She repeatedly refused his demands for sex but eventually acquiesced because she felt like "there was nothing [she] could do" to stop it from happening. Thereafter, at age 14 or 15, she regularly had sex with him on Wednesday mornings. She explained that if she refused to have sex with him, he would argue with her until she orally copulated him.

Considering the totality of the circumstances, we conclude a reasonable jury could find that counts five through fourteen were accomplished by duress, as they were premised on fear and express or implied threats of consequences sufficient to coerce a reasonable person of ordinary susceptibilities to perform an act which otherwise would not have been performed, or to acquiesce in an act to which one otherwise would not have submitted. A rational jury could have determined that S.D. was a vulnerable, isolated child who felt compelled to participate in the sex acts giving rise to the challenged convictions based on defendant's position of dominance and authority, his continuous exploitation of her from a young age, and his persistent psychological coercion. The fact that defendant began abusing S.D. at a young age and repeatedly abused her over many years is a relevant factor the jury could consider in finding that defendant accomplished the later sexual abuse by psychological coercion. (*People v. Senior*, *supra*, 3 Cal.App.4th at pp. 775-776 [duress used in a prior molestation can be evidence supporting duress for later molestations].) Given the evidence adduced at trial, a reasonable jury could have concluded that defendant used duress in the commission of counts five through fourteen. In view of our conclusion, we need not and do not discuss

14

whether there is substantial evidence to support the conclusion that counts five through fourteen were accomplished by other means, such as force.

In support of his argument that insufficient evidence supports a finding of duress, defendant primarily relies on *People v. Hecker* (1990) 219 Cal.App.3d 1238 (*Hecker*), overruled in part in *Soto*, *supra*, 51 Cal.4th at p. 248, fn. 12.)  In that case, the defendant was convicted of molesting his 12- or 13-year-old stepdaughter in their home (vaginal and anal intercourse) when they were alone. (*Hecker*, at pp. 1240-1242.)  The appellate court found there was insufficient evidence of duress because there was no evidence that the defendant expressly or implicitly threatened the victim; the victim admitted she was never consciously afraid the defendant would harm her and testified that with the exception of the defendant pushing her head down during the act of oral copulation, he never used physical force; and although the victim stated she felt "'pressured psychologically'" and was "'subconsciously afraid,'" there was no evidence the defendant was aware of and sought to take advantage of such fear.  (*Id.* at p. 1250.)  The *Hecker* court observed, "'[p]sychological coercion' without more does not establish duress.  At a minimum there must be an implied threat of 'force, violence, danger, hardship or retribution.'"  (*Id.* at pp. 1250-1251.)

*Hecker* is distinguishable for multiple reasons. First, the court's insufficiency of evidence finding was based on the statement that "'[p]sychological coercion,'" without more, is insufficient to establish duress.  (*Hecker*, *supra*, 219 Cal.App.3d at p. 1250.)  However, the same court that decided *Hecker* subsequently disagreed with that opinion in *Cochran*.  The *Cochran* court found that the language used in *Hecker* was "overly broad," and clarified that "[t]he very nature of duress is psychological coercion." (*Cochran*, *supra*, 103 Cal.App.4th at p. 15; see *Veale*, *supra*, 160 Cal.App.4th at p. 48 [distinguishing *Hecker* on the basis of *Cochran*].)  Further, after *Hecker* was decided, our Supreme Court employed an understanding of duress and coercion in child molestation that parallels *Cochran*, not *Hecker*, describing duress as "us[ing] some form of psychological coercion to get someone else to do something."  (*Soto*, supra, 51 Cal.4th at p. 243; see CALCRIM No. 1111, Bench Notes [indicating that duress is defined by *Soto*, *Leal*, *Pitmon*, and *Cochran*].)  Moreover, as we have described, our finding that there was sufficient evidence of duress is not based solely on psychological coercion.

Second, at seven years old, S.D. was significantly younger when the abuse began than the victim in *Hecker*.  S.D.'s young age rendered her more susceptible to psychological coercion and defendant's position of authority.  (*See Veale*, *supra*, 160 Cal.App.4th at pp. 43, 50 [six- or seven-year-old victim]; *People v. Pitmon*, *supra*, 170 Cal.App.3d at pp. 44, 51 [eight-year-old victim]; *Cochran*, *supra*, 103 Cal.App.4th at p. 15 [nine-year-old victim].)  Third, S.D. testified that she feared defendant because she had seen him throw things and threaten her sister during arguments, whereas the victim in *Hecker* was not "consciously afraid" of the

15

defendant.  (*Hecker*, *supra*, 219 Cal.App.3d at p. 1250.)  Fourth, unlike *Hecker*, here the record contains evidence that defendant used intimidation, threats, and fear to accomplish the sex acts. Fifth, here defendant used S.D.'s vulnerability to his advantage to continuously exploit her for years, whereas the abuse in *Hecker* involved two incidents that occurred over a one-year period when the victim was 12 or 13 years old.  (*Id.* at p. 1241.)

Finally, we reject defendant's attempt to establish an absence of duress by pointing to specific instances of molestation and arguing that there was no duress because he did not use force, violence, or threats to accomplish the *particular* sex act (e.g., the molests at the parking structure and the touching in the schoolgirl outfit).  As we have explained, a finding of duress properly turns on a consideration of the totality of the circumstances, including the victim's age and relationship to the defendant, the defendant's position of dominance and authority, the defendant's continuous exploitation of the victim, and evidence of threats of retribution. (*See People v. Cardenas*, *supra*, 21 Cal.App.4th at p. 940; CALCRIM Nos. 1000, 1015, 1111.)  The record, as discussed *ante*, reflects that by the time defendant engaged in the conduct giving rise to counts five through 14, he had consistently disregarded S.D.'s objections to the molestation and punished her (berated her, treated her "poorly") if she failed to comply with his sexual demands.  He had created an atmosphere in which S.D. did not object or otherwise resist his inappropriate touching because it had no effect; further, non-compliance resulted in retribution.  This same atmosphere was present in the later instances of molestation that occurred when S.D. was 13 to 15 years old.  Although S.D. attempted to resist defendant's advances during this time period, she eventually acquiesced to his sexual demands because he would continue to argue with her (which included yelling, screaming, and threats) until he got his way.  Under the specific circumstances of this case, a reasonable jury could find duress as to all the challenged counts.

ECF No. 24-10 at 12-21.  Petitioner petitioned the California Supreme Court to review this decision, which the California Supreme Court denied.  ECF No. 24-11 at 1.

Petitioner's claim should be denied.  First, to the extent petitioner challenges the state appellate court's interpretation of what amounts to "duress" under California law, I cannot second-guess the state appellate court's interpretation of state law on federal habeas review.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005) (holding that a state court's interpretation of state law "announced on direct appeal of the challenged conviction" controls in subsequent federal habeas proceedings attacking the same conviction).

1        To the extent petitioner's claim is simply that his conviction violates due process because

2   it is based on insufficient evidence, petitioner's claim should still fail.  Under the Fourteenth

3   Amendment's Due Process Clause, no person can suffer a criminal conviction "except upon

4   sufficient proof—defined as evidence necessary to convince a trier of fact beyond a reasonable

5   doubt of the existence of every element of the offense." *Jackson v. Virginia*, 443 U.S. 307, 316

6   (1979).  A habeas petitioner challenging the sufficiency of evidence under *Jackson* must

7   overcome "two layers of judicial deference."  *See Coleman v. Johnson*, 566 U.S. 650, 651 (2012).

8   On direct appeal, the state appellate court decides "whether, after viewing the evidence in the

9   light most favorable to the prosecution, any rational trier of fact could have found the essential

10  elements of the crime beyond a reasonable doubt." *Jackson*, 443 U.S. at 319.  On habeas review,

11  AEDPA's deferential standard applies, and a federal court may "overturn a state court decision

12  rejecting a sufficiency of the evidence challenge . . . only if the state court decision was

13  'objectively unreasonable'" under AEDPA. *Coleman*, 566 U.S. at 651 (quoting *Cavazos v. Smith*,

14  565 U.S. 1, 2 (2011)).  The "only question under *Jackson*" is whether the jury's finding was "so

15  insupportable as to fall below the threshold of bare rationality." *Id.* at 656.  It "is the

16  responsibility of the jury—not the court—to decide what conclusions should be drawn from

17  evidence admitted at trial." *Cavazos*, 565 U.S. at 4.

18       Here, the state appellate court reasonably determined that sufficient evidence established

19  that the victim participated in sexual activities with petitioner under duress.  The state appellate

20  court outlined the requirements of establishing duress, which "is objective in nature and not

21  dependent on the response exhibited by a particular victim." *People v. Soto*, 245 P.3d 410, 420

22  (Cal. 2011).  The California Supreme Court defines "duress" as used in § 288(b)(1) as meaning "a

23  direct or implied threat of force, violence, danger, hardship or retribution sufficient to coerce a

24  reasonable person of ordinary susceptibilities to (1) perform an act which otherwise would not

25  have been performed or, (2) acquiesce in an act to which one otherwise would not have

26  submitted." *People v. Leal*, 94 P.3d 1071, 1074 (Cal. 2004).  Thus, because duress is measured

27  by an objective standard, California juries can find that a defendant used threats or intimidation to

28  commit a lewd act without determining how the victim subjectively perceived or responded to

17

1  that behavior when finding a defendant guilty under § 288(b)(1).  *Soto*, 245 P.3d at 421.  Under

2  this law, which I am bound to follow, *see Bradshaw*, 546 U.S. at 76, petitioner's convictions on

3  counts five through fourteen are supported by sufficient evidence and do not violate due process.

4  As outlined in the state appellate decision, in viewing the evidence in a light most favorable to the

5  state, the state presented ample evidence of petitioner engaging in acts meant to either directly or

6  indirectly forced the victim into performing sexual activities with petitioner against her will.  As

7  such, the state appellate court's decision on this issue was not objectively unreasonable, *see*

8  *Coleman*, 566 U.S. at 651, and petitioner's claim should be denied.

9  **B.  Ineffective Assistance of Counsel**

10  Petitioner also argues that his trial counsel performed ineffectively during trial by failing

11  to object to the admission of expert testimony regarding Child Sexual Abuse Accommodation

12  Syndrome ("CSAAS").  ECF No. 1 at 16.  He contends that the evidence should never have been

13  admitted because it was based on "junk science," lightened the state's burden of proof, and misled

14  the jury.  *Id.*  He also contends that his trial counsel should have objected to the CSAAS expert's

15  cross-examination testimony because the expert's responses were non-responsive and irrelevant.

16  *Id.*  Petitioner contends that his trial counsel's allowance of this evidence into the trial and his

17  failure to object to the expert's testimony prejudiced him.  *Id.*  The state court of appeal rejected

18  these arguments in his direct appeal:

19      *Child Sexual Abuse Accommodation Syndrome (CSAAS) Evidence*

20      Defendant contends the trial court prejudicially erred in admitting
    expert testimony on CSAAS, which explains "common stress
21      reactions of children who have been sexually molested . . . which
    also may include the child's failure to report, or delay in reporting,
22      the abuse."  (*People v. McAlpin* (1991) 53 Cal.3d 1289,
    1300 (*McAlpin*).)  Noting his claim of evidentiary error has been
23      forfeited due to the failure to object in the trial court (*People v.
    Dykes* (2009) 46 Cal.4th 731, 756), defendant alternatively argues
24      trial counsel rendered ineffective assistance.  We agree as to
    forfeiture but disagree that defendant has carried his burden to show
25      ineffective assistance of counsel.

26      A. *Additional Background*

27      Prior to trial, the prosecution filed a motion requesting permission
    to call Dr. Blake Carmichael as an expert witness in the field of
28      CSAAS for the purpose of dispelling certain misconceptions the

jury might hold as to how sexually abused children react to the abuse, which may assist the jury in evaluating the credibility of the alleged victim.  Defendant did not file a written opposition to the motion or object at any time to the admission of CSAAS evidence.

At trial, Dr. Carmichael, a clinical psychologist at the University of California, Davis, Children's Hospital,[] testified as an expert witness in the areas of child sexual abuse and the effect of child sexual abuse on children.  Defense counsel did not object during Carmichael's testimony.

As relevant here, Dr. Carmichael testified on direct examination that CSAAS is a group of concepts that helps explain the behavior of children who have been sexually abused.  He emphasized that CSAAS is based on research of children who have been sexually abused and is not a diagnostic tool used to predict or determine whether a child has been sexually abused, but is used to educate people on the behavior patterns child sexual abuse victims tend to display and to dispel misconceptions about such victims.  The behavior patterns include secrecy, helplessness, accommodation, and delayed disclosure.

Dr. Carmichael testified in detail about the behavior patterns, explaining that it is common for sexually abused children to keep the abuse a secret, feel helpless to make it stop, and delay in reporting the abuse.  He explained that children are not typically abused by a stranger, but instead by someone who they know, trust, and care about.  He also explained that abused children often ignore or "tune out" the abuse while it is occurring as a way to cope with it, and that most children do not immediately report the abuse.  He stated that about 75 percent of abused children do not report the abuse within the first year, and that around 40 to 50 percent do not disclose the abuse until after they turn 18 years old.  He noted that only about 20 percent of children report the abuse "quickly."  He identified a variety of reasons for the delayed disclosure, including, fear, shame, guilt, and a desire on the victim's part to avoid getting into trouble or being judged or blamed for the abuse.  He noted that a child may also delay in disclosing the abuse to prevent the perpetrator from getting into trouble, especially if the child has a loving, caring relationship with the perpetrator.  Carmichael explained that a child may be more reluctant to immediately report the abuse if they feel like the recipient of the report is not going to believe them or will act in a hostile or angry way.  He also explained that when a child has a close relationship with the perpetrator, they tend not to disclose the abuse for a longer period of time, and to have a heightened sense of helplessness, amplified if he or she lives with the perpetrator.

Dr. Carmichael explained that children who have been consistently abused for many years have a difficult time remembering the details of specific incidents of abuse and when those incidents occurred. He also explained that it is not uncommon for a child to give up on trying to make the perpetrator stop abusing them when they realize their efforts are ineffective.  When asked, he indicated that it is not uncommon for a relationship between an abuser and a victim to

continue after the victim turns 18, and for the victim to continue to engage in the behavior patterns exhibited by children who have been sexually abused, including secrecy.

At the conclusion of direct examination, Dr. Carmichael stated that he was not aware of the facts of this case, and that he was not called by the prosecution to offer an opinion as to whether or not the alleged victim in this case had been sexually abused. He indicated that it was up to the jury to make that determination. He also acknowledged that "there are some people who take issue with [CSAAS] . . . [because] it can't predict if someone was sexually abused." He then said, "we all agree, you can't predict or use a tool to determine if a kid was sexually abused. That's why we have the law process and juries."

On cross-examination, defense counsel asked Dr. Carmichael if there was a common set of circumstances in which a delayed report of abuse is also a false report. Carmichael responded, "What we find . . . in the literature [is] that . . . false reports of sexual abuse are rare. Anywhere between 2 and 6 percent or so according to the research. [¶] And what we're actually finding is that the false reports of sexual abuse usually come from the parents and it's more typical in custody evaluations or custody disputes. And even in those circumstances where there were higher rates of false allegations, they were coming from the parents and not the victims themselves." When defense counsel asked whether the two to six percent of false reports concerned young children, Carmichael stated, "Abuse that occurred while they were children. And, again, in those cases, some of those studies, none of the children made false allegations of sexual abuse." Upon further questioning about false reporting, Carmichael stated, "What we're finding is that false reports of sexual abuse are rare, very low. That's what we are finding."

B. *Ineffective Assistance of Counsel*

To establish ineffective assistance of counsel, defendant must show: (1) counsel's representation was deficient in that it fell below an objective standard of reasonableness under prevailing professional norms; and (2) he was prejudiced by counsel's deficient performance. In determining prejudice, the inquiry is whether there is a reasonable probability that, but for counsel's deficiencies, defendant would have obtained a more favorable outcome. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 692-694; *People v. Frye* (1998) 18 Cal.4th 894, 979, overruled on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) "A reasonable probability is a probability sufficient to undermine confidence in the outcome." (*Strickland*, at p. 694; *In re Harris* (1993) 5 Cal.4th 813, 833.) "[T]he question is 'whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair.'" (*In re Harris*, at p. 833.) To show prejudice, "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." (*Strickland*, at p. 693.)

20

C. *Expert Testimony Regarding CSAAS*

Defendant first contends that trial counsel rendered ineffective assistance by failing to object to the CSAAS evidence elicited on direct examination because: (1) the evidence lacked probative value and was not relevant to the facts of this case; (2) the evidence does not meet the legal requirements for the admissibility of scientific evidence; [and] (3) expert testimony on the subject is not required, and allowing such evidence has the effect of bolstering the victim's credibility based on the misuse of "pseudoscience" . . . . We disagree.

Numerous courts have found expert testimony concerning CSAAS properly admitted in sexual abuse cases. (*See, e.g.*, *In re S.C.* (2006) 138 Cal.App.4th 396, 418 [collecting cases]; *see also McAlpin, supra,* 53 Cal.3d at pp. 1300-1301.) Our supreme court has explained that "expert testimony on the common reactions of child molestation victims is not admissible to prove that the complaining witness has in fact been sexually abused; it is admissible to rehabilitate such witness's credibility when the defendant suggests that the child's conduct after the incident—e.g., a delay in reporting—is inconsistent with his or her testimony claiming molestation. [Citations.] 'Such expert testimony is needed to disabuse jurors of commonly held misconceptions about child sexual abuse, and to explain the emotional antecedents of abused children's seemingly self-impeaching behavior.'" (*McAlpin*, at pp. 1300-1301, fn. omitted; *see People v. Patino* (1994) 26 Cal.App.4th 1737, 1744-1745 [where the victim's credibility is placed at issue due to seemingly counterintuitive behavior, including a delay in reporting molestation, CSAA evidence is pertinent and admissible to rehabilitate the victim's credibility by showing that his or her reactions are not inconsistent with abuse].)

Here, S.D.'s credibility was the central issue at trial. She delayed reporting the sexual abuse for a substantial period of time and admitted that she gave up on trying to stop defendant from molesting her when she between the ages of seven and 10 years old. She also admitted that she continued to have a relationship with defendant for years after the molestation began, including living with him and repeatedly having sex with him between the ages of 14 and 24. As previously indicated, the defense theory was fabrication of all claims beyond the consensual sexual relationship after the victim was 18. The defense posited that S.D. was lying about the molestation because she did not want her family to reject her for having a sexual relationship with her sister's boyfriend. On cross-examination, defense counsel attacked S.D.'s credibility by suggesting that her conduct following the alleged molestation was inconsistent with her testimony claiming the molestation occurred, including her conduct in continuing to spend the night at defendant's residence and living with him during high school and in college, going on trips with him as an adult, repeatedly having sexual intercourse with him as an adult, and "express[ing] loving sentiment" to him in birthday and Valentine's Day cards. On this record, the prosecution was entitled to present CSAAS evidence,

1   which was relevant and admissible as to S.D.'s credibility. We
    reject defendant's claim that jurors no longer harbor confusion or
2   misconceptions about how children react to sexual abuse. And we
    decline to overturn California's long-standing rule allowing
3   CSAAS evidence where, as here, the victim's credibility is placed
    at issue due to counterintuitive behavior. We are bound to follow
4   our Supreme Court's decision permitting the admission of CSAAS
    evidence for the limited purpose it was admitted here. (*McAlpin,*
5   *supra,* 53 Cal.3d at pp. 1300-1301; *Auto Equity, supra,* 57 Cal.2d at
    p. 455.) For that reason, defendant's reliance on out-of-state cases
6   that find CSAAS evidence inadmissible is misplaced.

7   Trial counsel was not deficient for failing to object to the CSAAS
    testimony because it fails to satisfy the legal requirements for the
8   admissibility of new scientific methodologies under *People v.*
    *Kelly* (1976) 17 Cal.3d 24 and *Frye v. United States* (D.C. Cir.
9   1923) 293 Fed. 1013 (*Kelly/Frye* rule). The *Kelly/Frye* rule does
    not apply where, as here, the CSAAS testimony is admitted "'for
10  the limited purpose of disabusing [the] jury of misconceptions it
    might hold about how a child reacts to a molestation.'" (*People v.*
11  *Wells* (2004) 118 Cal.App.4th 179, 188.) When introduced for that
    purpose, and when, as here, the evidence is limited to the expert's
12  own clinical experience and familiarity with relevant professional
    literature, the CSAAS evidence does not implicate *Kelly/Frye*
13  principles. (*People v. Harlan* (1990) 222 Cal.App.3d 439, 448-
    449.)
14
    Finally, we reject defendant's contention that trial counsel was
15  deficient for failing to object to the CSAAS evidence on the ground
    it was unduly prejudicial under Evidence Code section 352. As
16  discussed above, S.D.'s credibility was the critical issue at trial and
    she admitted conduct that was arguably inconsistent with having
17  been sexually abused by defendant. Thus, Dr. Carmichael's
    testimony regarding arguably inconsistent behaviors was highly
18  probative for the purpose of rebutting common misperceptions
    about how a child should react to sexual abuse. The testimony
19  helped the jury place into a proper context S.D.'s delayed reporting
    and her continuous contact with her abuser. Nor was the
20  considerable probative value of the CSAAS evidence substantially
    outweighed by its prejudicial impact. We are not persuaded by
21  defendant's contention that he was "unfairly disadvantage[d]" by
    the CSAAS evidence because "it allows no possibility for the
22  reality that a witness has credibility problems, actually lied, and/or
    the abuse never happened." Carmichael explained that the purpose
23  of CSAAS evidence was to educate people about the behavior of
    children who have been sexually abused and to dispel
24  misconceptions about them. He emphasized that CSAAS is not a
    diagnostic tool and that he was not called to offer an opinion as to
25  whether or not S.D. had been sexually abused by defendant. He
    said that it was the jury's role to make that determination. On this
26  record, we cannot conclude that trial counsel was deficient for
    failing to object to the CSAAS evidence under Evidence Code
27  section 352; the objection would not have been well taken.

28

D. *Expert Testimony Regarding False Allegations of Sexual Abuse*

Defendant next contends that trial counsel rendered ineffective assistance by failing to object when Dr. Carmichael testified on cross-examination that false reports of sexual abuse are and typically made by a parent involved in a custody dispute and not from the victims themselves.  The Attorney General agrees that this testimony was improper, but argues forfeiture and harmless error.

We agree with the parties that admission of this testimony was error.  (See *People v. Julian* (2019) 34 Cal.App.5th 878, 885-886 [concluding similar statistics were not admissible as CSAAS evidence]; *People v. Wilson* (2019) 33 Cal.App.5th 559, 569-571.)  However, we conclude that defendant has not shown a reasonable probability that, but for the evidentiary error to which his counsel failed to object, the outcome of the proceeding would have been more favorable to him.  (See *Strickland v. Washington, supra,* 466 U.S. at pp. 694-694.)

Contrary to defendant's contentions, we conclude here that Dr. Carmichael's testimony about false reports of child abuse was not "tantamount" to improper vouching for the credibility of the victim, nor did it supplant the jury.  As we have explained, Carmichael did not express an opinion on whether S.D. had been sexually abused.  He did not testify that he believed S.D. was telling the truth or that he thought defendant was guilty of sexually abusing her.  (*See People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 82 [expert testimony that codefendant was credible should have been excluded on proper objection]; *People v. Sergill* (1982) 138 Cal.App.3d 34, 39 [trial court erred in permitting police officers to testify that in their opinion a certain witness was credible].)  Rather, as we have discussed, he expressly declined to opine on this case or S.D.'s credibility and added that it was the jury's decision, not his.

Under the circumstances of this case, we are not persuaded that there is a reasonable probability that, but for the improper testimony, defendant would have obtained a more favorable outcome.  The challenged testimony was brief in duration and the case against defendant, independent of the challenged testimony, was strong.  The challenged testimony comprises only about two pages of the reporter's transcript, which spans over 800 pages from opening statements through closing arguments.  By contrast, S.D., who was 26 years old at the time of trial, testified at length about the molestation, giving the jury ample opportunity to assess her credibility.  (*People v. Wilson, supra*, 33 Cal.App.5th at p. 572 [finding no prejudice in admitting statistical evidence about false allegations where expert's testimony was brief and complaining witnesses testified extensively].)  The jury also heard the audio recordings of the pretext phone calls and testimony regarding an uncharged act of sexual misconduct involving defendant, which, as we have described, was highly probative.  As we have set forth *ante*, during the pretext calls defendant did not deny the accusations of abuse and only took exception to the characterization of his conduct as "rape"; further, he apologized and showed remorse.

1

2

3

4

5

6

7

8

9

10

11

12

13

> Finally, in closing argument, the prosecutor did not mention the statistical evidence and specifically told the jury that Dr. Carmichael "was not here to tell you that [S.D.] was molested or that [she] was sexually assaulted. That is your decision for each and every single one of these counts, that decision is up to you. The reason you heard from Dr. Carmichael is to put [S.D.'s] actions in context."[] The jury was specifically instructed that Carmichael's testimony was not evidence that any molestation occurred, and that his testimony could only be considered in deciding whether or not S.D.'s conduct was inconsistent with the conduct of someone who has been molested and evaluating the believability of her testimony. (CALCRIM No. 1193.) The jury was further instructed that it was the sole judge of the facts (CALCRIM No. 222 (Evidence)) and the credibility of the witnesses (CALCRIM No. 226 (Witnesses)), and that "certain evidence was admitted for a limited purpose," and to "consider that evidence only for that purpose and for no other" (CALCRIM No. 303 (Limited Purpose Evidence in General)). We presume the jury understood and followed these instructions. (*Edwards*, *supra*, 57 Cal.4th at p. 746.)
>
> On this record, we conclude there was no prejudice from the erroneous admission of the improper evidence and the failure to object thereto.

14   ECF No. 24-10 at 34-43. Petitioner petitioned the California Supreme Court to review this

15   decision, as well, which the California Supreme Court denied. ECF No. 24-11 at 1.

16         Petitioner's claim should be denied. A "doubly" deferential standard governs a federal

17   habeas petitioner's claim of ineffective assistance of counsel. *See Richter*, 562 U.S. at 105. On

18   direct appeal, the two-step inquiry from *Strickland v. Washington* guides the analysis for an

19   ineffective-assistance-of-counsel claim. *See* 466 U.S. 668, 687 (1984). First, a criminal

20   defendant must show some deficient performance by counsel that is "so serious that counsel was

21   not functioning as the counsel guaranteed the defendant by the Sixth Amendment." *Id.* Second,

22   the defendant must show that the deficient performance caused him prejudice, which requires

23   "showing that counsel's errors were so serious as to deprive [the petitioner] of a fair trial." *Id.*

24   On habeas review, coupled with § 2254(d)'s fairminded jurist standard, the *Strickland*

25   requirements become even more deferential: the question is "whether there is *any* reasonable

26   argument that counsel satisfied *Strickland*'s deferential standard." *Richter*, 562 U.S. at 105

27   (emphasis added). That is, if there is even one reasonable argument that counsel did not violate

28

1    the *Strickland* standard—even if the state court has not identified such argument—the petitioner

2    cannot obtain habeas relief.  *See id.* at 106.

3            Regarding the admission of the CSAAS evidence generally, the state appellate court's

4    determination that petitioner's trial counsel did not perform deficiently is not an unreasonable

5    application of, or contrary to, federal law.  The state appellate court determined that, had

6    petitioner's trial counsel objected to the admission of this evidence, such objection would have

7    been meritless under California law.  *See* ECF No. 24-10 at 38-41.  Upon independent review of

8    the case law, the state appellate court's determination is an accurate reflection of state law.  *See In*

9    *re S.C.*, 41 Cal. Rptr. 3d 453, 472 (Cal. App. 2006) ("[I]t has long been held that in a judicial

10   proceeding presenting the question whether a child has been sexually molested, CSAAS is

11   admissible evidence for the limited purpose of disabusing the fact finder of common

12   misconceptions it might have about how child victims react to sexual abuse.").  Accordingly,

13   "trial counsel cannot have been ineffective for failing to raise a meritless objection."  *Juan H. v.*

14   *Allen*, 408 F.3d 1262, 1273-74 (9th Cir. 2005), *amended*, No. 04-15562, 2005 WL 1653617 (9th

15   Cir. July 8, 2005) ("The California Court of Appeal was not objectively unreasonable in holding

16   that the performance of counsel did not fall below an 'objective standard of reasonableness' on

17   account of not raising this meritless objection." (citation omitted)).  Thus, petitioner's ineffective

18   assistance of counsel claim based on the general admission of the CSAAS evidence should be

19   denied.

20           Petitioner's ineffective assistance of counsel claim based on counsel's failure to object to

21   the CSAAS expert's cross-examination testimony should also be denied because petitioner cannot

22   demonstrate prejudice.  "Prejudice exists if 'there is a reasonable probability that, but for

23   counsel's unprofessional errors, the result of the proceeding would have been different.'"  *Fields*

24   *v. Brown*, 503 F.3d 755, 776 (9th Cir. 2007) (quoting *Strickland*, 466 U.S. at 694).  Here, the state

25   appellate court explained, and the record confirms, that the expert's testimony did not improperly

26   bolster the state's case, and the jury was supplied a plethora of evidence to consider alongside the

27   expert's statistical testimony.  *See* ECF No. 24-10 at 42-43.  In light of this evidence, there is no

28   reasonable probability that but for petitioner's counsel's failure to object to the expert's cross-

1   examination testimony that the outcome of the proceedings would have been different.  *See*

2   *Fields*, 503 F.3d at 776; *see also Strickland*, 466 U.S. at 694.  As such, the state appellate court's

3   determination that petitioner's counsel's deficiencies did not prejudice petitioner is not an

4   unreasonable application of, or contrary to, federal law, and this claim should be denied.

5                    **C.  California Evidence Code § 1108**

6         Petitioner argues that California Evidence Code § 1108 violates his Fourteenth

7   Amendment right to due process and a fair trial because it allowed for the admission of sexual

8   offenses that were only subject to a preponderance of the evidence standard.  ECF No. 1 at 17.

9   The state court of appeal rejected these arguments in his direct appeal:

10        *Admission of Propensity Evidence Under Evidence Code Section*
          *1108*

11

12        Defendant contends the trial court prejudicially erred in admitting
          evidence of uncharged sexual misconduct under Evidence Code
13        section 1108.  We disagree.

14        A. *Applicable Legal Principles*

15        California law generally prohibits the introduction of character
          evidence to prove a defendant's propensity to commit conduct on a
          specific occasion.  (Evid. Code, § 1101, subd. (a); *People v.*
16        *Falsetta* (1999) 21 Cal.4th 903, 911.)  Evidence Code section
          1108 is an exception to the general rule.  It provides: "In a criminal
17        action in which the defendant is accused of a sexual offense,
          evidence of the defendant's commission of another sexual offense
18        or offenses is not made inadmissible by [Evid. Code] Section 1101,
          if the evidence is not inadmissible pursuant to [Evid. Code] Section
19        352."  (§ 1108, subd. (a).)  Evidence Code section 1108 thus
          permits the admission of evidence that the defendant in a sexual
20        offense prosecution "committed other sexual offenses to prove his
          propensity to commit the charged sexual offenses."  (*People v.*
21        *Cottone* (2013) 57 Cal.4th 269, 281.)  "The evidence is presumed
          admissible and is to be excluded only if its prejudicial effect
22        substantially outweighs its probative value in showing the
          defendant's disposition to commit the charged sex offense or other
23        relevant matters.  [Citations.]  The court's ruling admitting the
          evidence is reviewed for abuse of discretion."  (*People v.*
24        *Cordova* (2015) 62 Cal.4th 104, 132.)

25        "To determine whether [Evid. Code] section 1108 evidence is
          admissible, trial courts must engage in a 'careful weighing process'
26        under [Evid. Code] section 352.  [Citation.]  'Rather than admit or
          exclude every sex offense a defendant commits, trial judges must
27        consider such factors as its nature, relevance, and possible
          remoteness, the degree of certainty of its commission and the
28        likelihood of confusing, misleading, or distracting the jurors from

                                    26

their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense. [Citations.]'"  (*People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 823-824.)

Under Evidence Code section 352, "[t]he court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." "'"'Evidence is not prejudicial, as that term is used [in the statute], merely because it undermines the opponent's position or shores up that of the proponent.  The ability to do so is what makes evidence relevant.  The code speaks in terms of undue prejudice.  Unless the dangers of undue prejudice, confusion, or time consumption "'substantially outweigh'" the probative value of relevant evidence, [an Evid. Code] section 352 objection should fail.  [Citation.] "'The "prejudice" referred to in Evidence Code section 352 applies to evidence which uniquely tends to evoke an emotional bias against the defendant as an individual and which has very little effect on the issues.  In applying [Evid. Code] section 352, "prejudicial" is not synonymous with "damaging." '[Citation.]' [Citation.]  [¶]  The prejudice that [Evid. Code] section 352 "'is designed to avoid is not the prejudice or damage to a defense that naturally flows from relevant, highly probative evidence.' [Citations.]  'Rather, the statute uses the word in its etymological sense of "prejudging" a person or cause on the basis of extraneous factors.'"'"'"  (*People v. Bryant, Smith and Wheeler* (2014) 60 Cal.4th 335, 408.)

We review for abuse of discretion.  "'"[R]eversal is not required, unless the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice."'"  (*People v. Lewis* (2009) 46 Cal.4th 1255, 1286.)

B. *Additional Background*

Prior to trial, the prosecution filed a motion requesting permission to introduce evidence of an uncharged act of sexual misconduct committed by defendant.  The evidence proffered by the prosecution related to an alleged sexual assault by defendant that occurred in or around 2002.  Prior to the alleged assault, N.D., her older sister (K.D.), and K.D.'s friend (D.D.) were all hanging out and drinking alcohol at defendant's apartment.  N.D., who was approximately 15 years old, did not know defendant.  She knew D.D., who is S.D. and Ella's cousin.  When N.D. started to feel ill, defendant suggested that she go upstairs and lie down.  Later, while N.D. was asleep, defendant allegedly inserted his fingers into her vagina, which caused her to wake up.  She became hysterical, screamed, and ran downstairs to K.D. and D.D.  N.D.'s mother was

called but the incident was not reported to law enforcement.  The prosecution argued that the proffered evidence was admissible under Evidence Code section 1108 to prove defendant's propensity to commit the sex offenses charged in this case, and that the relevant factors weighed in favor of admitting the evidence under Evidence Code section 352.

On the same day as the prosecution filed its motion, the defense filed a document indicating that it intended to make an oral motion seeking to exclude any reference to defendant's alleged sexual assault of N.D.

After hearing argument from counsel, the trial court ruled that the uncharged sexual misconduct evidence was admissible.  In doing so, the court stated: "[The evidence] will be admitted pursuant to 1108.  I don't find it unduly prejudicial.  It's well within the ambit of what the legislature intended in the passage of 1108 of the Evidence Code."

At trial, N.D. and D.D. testified as prosecution witnesses about the uncharged act of sexual misconduct.  Ella testified about the incident for the defense, and K.D. testified as a rebuttal witness.

Prior to deliberations, the trial court instructed the jury pursuant to CALCRIM No. 1191A (Evidence of Uncharged Sex Offense) as follows: "The People presented evidence that the defendant committed a crime against [N.D.], specifically a lewd and lascivious act, to wit, his finger to [N.D.'s] vagina.  That was not charged in this case.  The definition of such a crime is provided in instruction 1112, which I will give you in a moment.  [¶]  You may consider this evidence only if the People have proved by a preponderance of the evidence that the defendant in fact committed the uncharged offense.  Proof by a preponderance of the evidence is a different burden of proof from proof beyond a reasonable doubt.  A fact is proved by a preponderance of the evidence if you conclude that it is more likely than not that the fact is true.  [¶]  If the People have not met this burden of proof, you must disregard this evidence entirely.  If you decide that the defendant committed the uncharged offense, you may, but are not required to, conclude from that evidence that the defendant was disposed or inclined to commit sexual offenses, and based on that decision, also conclude that the defendant was likely to commit and did commit the crimes charged in this case.  [¶]  If you conclude that the defendant committed the uncharged offense, that conclusion is only one factor to consider along with all the other evidence.  It is not sufficient by itself to prove that the defendant is guilty of any of the crimes charged in this case.  The People must still prove each charge beyond a reasonable doubt."

C. *Analysis*

We reject defendant's initial contention that Evidence Code section 1108 is facially invalid because it violates a defendant's constitutional rights to due process and a fair trial.  In making this argument, defendant acknowledges that our Supreme Court has

held that the statute does not violate due process principles. (*People v. Falsetta, supra,* 21 Cal.4th at pp. 907, 915-922; *see also People v. Rhoades* (2019) 8 Cal.5th 393, 415 [rejecting contention that Evid. Code, § 1108 violated defendant's due process and fair trial rights]; *People v. Molano* (2019) 7 Cal.5th 620, 664 [noting that the court has repeatedly declined to reconsider its holding in Falsetta].)  He only raises the due process argument here to preserve the issue for further review.  Because we are bound by decisions issued by our Supreme Court (*Auto Equity, supra,* 57 Cal.2d at p. 455), no further discussion of this issue is required.

We also reject defendant's "as-applied" challenge to Evidence Code section 1108.  According to defendant, reversal is required because allowing the prosecutor to introduce propensity evidence under Evidence Code sections 1108 and 352, in combination with instructing the jury with CALCRIM No. 1191A, effectively lowered the prosecution's burden of proof in violation of his constitutional rights to due process and a fair trial.  He argues that it was "unfair and unnecessary" to allow the prosecution to argue that he had a propensity to commit the charged sex offenses because a preponderance of the evidence supported the conclusion that he had committed a prior similar uncharged sex offense against a different victim.  He further argues that, "[b]ecause the only contested issue as to the current charges was whether [he] or [S.D.] was the one telling the truth," allowing the evidence "gave a false aura of credibility to [S.D.] and lowered the prosecution's burden" of proof.

Preliminarily, we note that defendant's claim of evidentiary error is forfeited for failure to object on the same ground in the trial court. (*People v. McKinnon* (2011) 52 Cal.4th 610, 674.)  In any event, we find no merit in defendant's argument.  As a panel of this court recently explained in *People v. Phea* (2018) 29 Cal.App.5th 583, CALCRIM No. 1191A is a correct statement of the law and to apply the preponderance standard to evidence admitted under Evidence Code section 1108 does not reduce the prosecution's burden of proof as to the charged offenses.  (*Phea*, at pp. 608-609, citing *People v. Villatoro* (2012) 54 Cal.4th 1152, 1160; *People v. Reliford* (2003) 29 Cal.4th 1007, 1012-1016 (Reliford).)[]  Defendant's contention that Evidence Code section 1108's propensity inference resulted in a lower burden of proof for the prosecution is belied by the trial court's instructions to the jury.  The CALCRIM No. 1191A instruction, as given here, stated that if the jury found by a preponderance of the evidence that defendant committed the uncharged sexual offense against N.D., it could, but was not required to, conclude that he was disposed or inclined to commit sexual offenses and that it was likely he committed the charged sexual offenses, but that conclusion was "only one factor to consider along with all the other evidence" and was "not sufficient by itself" to prove the charged offenses: "The People must still prove each charge beyond a reasonable doubt."  The jury also was instructed that the People had the burden to prove that defendant was guilty beyond a reasonable doubt, and that whenever the instructions indicate that the People must prove something, it means they must prove it beyond a reasonable doubt,

1    unless the instruction says otherwise.  (CALCRIM No.
     220 (Reasonable Doubt).)  We presume the jury understood and
2    followed these instructions. (*Edwards, supra,* 57 Cal.4th at p. 746.)
     Therefore, we conclude that the prosecution's burden of proof was
3    not lowered here.

4    . . .

5    We see no error.

6    ECF No. 24-10 at 26-33.  Similar to the other claims, petitioner petitioned the California Supreme

7    Court to review this decision, which the California Supreme Court denied.  ECF No. 24-11 at 1.

8          Petitioner's claim should be denied, because he has not shown that his state proceeding—

9    bound by *People v. Falsetta*, 986 P.2d 182, 186-93 (Cal. 1999)—"resulted in a decision that was

10   contrary to, or involved an unreasonable application of, clearly established *Federal* law, as

11   determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1) (emphasis

12   added).  Petitioner cites no holding of the Supreme Court suggesting that the instruction at issue

13   or the California Supreme Court's decision in *Falsetta* are unconstitutional.  In fact, the Supreme

14   Court has expressly withheld judgment on the question of whether a state law that permits the use

15   of prior crime evidence to show propensity violates due process.  *See Estelle v. McGuire*, 502

16   U.S. 62, 75 n.5 (1991) ("[W]e express no opinion on whether a state law would violate the Due

17   Process Clause if it permitted the use of 'prior crimes' evidence to show propensity to commit a

18   charged crime.").  For this reason, the Ninth Circuit has repeatedly affirmed decisions denying

19   habeas petitions in similar contexts.  *See, e.g.*, *Delira v. Runnels*, 213 F. App'x 580, 581 (9th Cir.

20   2006) ("The admission of [propensity] evidence was not contrary to, nor an unreasonable

21   application of, clearly established federal law, as the Supreme Court has not ruled on the question

22   whether propensity evidence violates the Due Process Clause."); *Salazar v. Galaza*, No. 04-

23   17063, 2005 WL 3113475, at *1 (9th Cir. 2005) ("The California Court of Appeal's

24   determination that the jury instructions regarding prior sexual offenses did not violate Salazar's

25   due process rights is not contrary to clearly established federal law."); *Turner v. Mayle*, 84 F.

26   App'x 866, 868 (9th Cir. 2003) ("Turner claims that California Evidence Code § 1108 violates

27   due process by allowing admission of evidence of prior sexual crimes. . . . We reject this

28

30

1  argument because the Supreme Court has explicitly left open the question of whether the

2  admission of evidence of other crimes solely to prove propensity violates due process.").  Here,

3  likewise, the state appellate court's decision on propensity issue was not contrary to clearly

4  established federal law, and I have no authority to second-guess it.

5  **D.  CALCRIM No. 1191A**

6  Finally, petitioner contends that jury instruction CALCRIM No. 1191A improperly

7  instructed the jury that it could consider uncharged offenses during deliberations.  ECF No. 1 at

8  17.  He argues that allowing the jury to consider uncharged offense conduct allowed the jury to

9  infer guilt, which violated his due process rights.  *Id.*  The state court of appeal rejected these

10  arguments in his direct appeal:

11  > *CALCRIM No. 1191A*

12  > Defendant contends reversal is required because CALCRIM No.
13  > 1191A is invalid.  He argues the pattern instruction impermissibly
> allows jurors to infer guilt on the charged offenses based on the
14  > commission of an uncharged offense, which must only be proved
> by a preponderance of the evidence.  He further argues the
15  > instruction confused and mislead the jury about the burden of proof
> in violation of his due process rights.  In making these arguments,
16  > defendant acknowledges that our Supreme Court has held that a
> predecessor instruction was a correct statement of the law.
17  > (*Reliford, supra*, 29 Cal.4th at p. 1016 [holding that CALJIC No.
> 2.50.01 is a correct statement of the law]; *see also People v.*
18  > *Villatoro, supra*, 54 Cal.4th at p. 1160 [noting that there is "'no
> material difference'" between CALCRIM No. 1191 and its
> predecessor, CALJIC No. 2.50.01].)  He also acknowledges that we
19  > are bound to follow that precedent (*Auto Equity, supra*, 57 Cal.2d at
> p. 455), and only raises the issue to preserve it for further review.
20
21  > As a panel of this court recently explained, all but one of
> defendant's arguments concerning CALCRIM No. 1191A are
22  > foreclosed by the analysis and conclusions in *Reliford*.  (*People v.*
> *Phea, supra*, 29 Cal.App.5th at p. 609, citing *Reliford, supra*, 29
23  > Cal.4th at pp. 1013-1016.)  For the reasons stated in *Phea*, which
> addressed a similar argument, we also reject defendant's remaining
24  > contention, that CALCRIM No. 1191A contradicts CALCRIM No.
> 224 (Circumstantial Evidence: Sufficiency of Evidence)[] by telling
25  > jurors they may use facts proved only by a preponderance of the
> evidence to infer the defendant has a disposition to engage in sexual
26  > offenses, and may conclude the defendant is likely to commit the
> charged offenses if they conclude he has such a disposition.
27  > (*See Phea*, at pp. 609-615.)

28

31

1   ECF No. 24-10 at 33-34.  Petitioner petitioned the California Supreme Court to review this

2   decision, which the California Supreme Court denied.  ECF No. 24-11 at 1.

3        Generally, claims of instructional error are questions of state law and are not cognizable

4   on federal habeas review.  *See Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005) ("The

5   court's determination that this instruction was not appropriate . . . resulted from interpretation of

6   state law.  Any error in the state court's determination of whether state law allowed for an

7   instruction in this case cannot form the basis for federal habeas relief.").  "[T]he fact that [an]

8   instruction was allegedly incorrect under state law is not a basis for habeas relief."  *Estelle*, 502

9   U.S. at 71-72 (citing *Marshall v. Lonberger*, 459 U.S. 422, 438, n.6 (1983) ("[T]he Due Process

10  Clause does not permit the federal courts to engage in a finely tuned review of the wisdom of

11  state evidentiary rules.")).  As noted earlier, "a state court's interpretation of state law, including

12  one announced on direct appeal of the challenged conviction, binds a federal court sitting in

13  habeas corpus."  *Bradshaw*, 546 U.S. at 76; *see also Romero v. Cal. Dep't of Corr. and Rehab.*,

14  405 F. App'x 208, 211 (9th Cir. 2010) ("The California Court of Appeal's conclusion that the

15  instructions were adequate as a matter of state law binds us."); *Gonzalez v. Gonzalez*, 394 F.

16  App'x 415, 415 (9th Cir. 2010) ("The California Court of Appeal's conclusion that there was no

17  instructional error is a binding interpretation of state law.").

18       A petitioner may not "transform a state-law issue into a federal one merely by asserting a

19  violation of due process."  *Langford v. Day*, 110 F.3d 1380, 1389 (9th Cir. 1997) (citing *Melugin

20  v. Hames*, 38 F.3d 1478, 1482 (9th Cir. 1994)).  To prevail on a collateral attack of state-court

21  jury instructions, a petitioner must do more than prove that the instruction was erroneous.  *See

22  Henderson v. Kibbe*, 431 U.S. 145, 154 (1977).  The petitioner must prove that the improper

23  instruction "by itself so infected the entire trial that the resulting conviction violated due process."

24  *Estelle*, 502 U.S. at 72 (internal citations omitted).  Even if there were constitutional error, habeas

25  relief cannot be granted absent a "substantial and injurious effect" on the verdict.  *Brecht v.

26  Abrahamson*, 507 U.S. 619, 637 (1993) (quoting *Kotteakos v. United States*, 328 U.S. 750, 776

27  (1946)).  A state prisoner is not entitled to federal habeas relief unless the instructional error

28  resulted in "actual prejudice."  *Id.*  If the court is convinced that the error did not influence the

1     jury, or had little effect, the judgment should stand. *See O'Neal v. McAninch*, 513 U.S. 432, 437

2     (1995).

3         A federal court's review of a claim of instructional error is highly deferential. *See*

4     *Masoner v. Thurman*, 996 F.2d 1003, 1006 (9th Cir. 1993). A reviewing court may not judge the

5     instruction in isolation but must consider the context of the entire record and of the instructions as

6     a whole. *See id.* The mere possibility of a different verdict is too speculative to justify a finding

7     of constitutional error. *See Henderson*, 431 U.S. at 157.

8         Petitioner's claim should be denied. The challenged instruction does not create a

9     reasonable likelihood of misinterpretation by the jury. On the contrary, the instructions explain

10    that, even if the jury concludes that the defendant was disposed to commit sexual offenses, the

11    charged offenses must be proved beyond a reasonable doubt—as the federal Constitution

12    requires. *See In re Winship*, 397 U.S. 358, 364 (1970) ("[T]he Due Process Clause protects the

13    accused against conviction except upon proof beyond a reasonable doubt of every fact necessary

14    to constitute the crime with which he is charged."); *see also* ECF No. 24-10 at 32 ("The jury also

15    was instructed that the People had the burden to prove that defendant was guilty beyond a

16    reasonable doubt, and that whenever the instructions indicate that the People must prove

17    something, it means they must prove it beyond a reasonable doubt, unless the instruction says

18    otherwise."). The state appellate court violated no federal law in concluding that the instructions

19    in this case complied with this federal constitutional requirement. *See Schultz v. Tilton*, 659 F.3d

20    941, 945 (9th Cir. 2011) (rejecting challenge to the predecessor of CALCRIM No. 1191A

21    because the instructions "in no way suggest[] that a jury could reasonably convict a defendant for

22    charged offenses based merely on a preponderance of the evidence"). Accordingly, petitioner's

23    challenge to CALCRIM No. 1191A should be denied.

24         Accordingly, it is hereby RECOMMENDED that:

25         1. The petition, ECF No. 1, be DENIED;

26         2. The court decline to issue the certificate of appealability referenced in 28 U.S.C.

27    § 2253; and

28         3. The Clerk of Court be directed to close this case and to enter judgment accordingly.

1       These findings and recommendations are submitted to the United States District Judge

2 assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within fourteen days

3 of service of these findings and recommendations, any party may file written objections with the

4 court and serve a copy on all parties.  Any such document should be captioned "Objections to

5 Magistrate Judge's Findings and Recommendations," and any response shall be served and filed

6 within fourteen days of service of the objections.  The parties are advised that failure to file

7 objections within the specified time may waive the right to appeal the District Court's order.  *See*

8 *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir.

9 1991).

10

11 IT IS SO ORDERED.

12

13 Dated:   May 14, 2025

                                               JEREMY D. PETERSON

14                                                UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28